(Slip Opinion)       OCTOBER TERM, 2010       1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STERN, EXECUTOR OF THE ESTATE OF MARSHALL *v.* MARSHALL, EXECUTRIX OF THE ESTATE OF MARSHALL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–179. Argued January 18, 2011—Decided June 23, 2011

Article III, §1, of the Constitution mandates that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," and provides that the judges of those constitutional courts "shall hold their Offices during good Behaviour" and "receive for their Services[ ] a Compensation[ ] [that] shall not be diminished" during their tenure. The questions presented in this case are whether a bankruptcy court judge who did not enjoy such tenure and salary protections had the authority under 28 U. S. C. §157 and Article III to enter final judgment on a counterclaim filed by Vickie Lynn Marshall (whose estate is the petitioner) against Pierce Marshall (whose estate is the respondent) in Vickie's bankruptcy proceedings.

Vickie married J. Howard Marshall II, Pierce's father, approximately a year before his death. Shortly before J. Howard died, Vickie filed a suit against Pierce in Texas state court, asserting that J. Howard meant to provide for Vickie through a trust, and Pierce tortiously interfered with that gift. After J. Howard died, Vickie filed for bankruptcy in federal court. Pierce filed a proof of claim in that proceeding, asserting that he should be able to recover damages from Vickie's bankruptcy estate because Vickie had defamed him by inducing her lawyers to tell the press that he had engaged in fraud in controlling his father's assets. Vickie responded by filing a counterclaim for tortious interference with the gift she expected from J. Howard.

The Bankruptcy Court granted Vickie summary judgment on the defamation claim and eventually awarded her hundreds of millions of dollars in damages on her counterclaim. Pierce objected that the

Bankruptcy Court lacked jurisdiction to enter a final judgment on that counterclaim because it was not a "core proceeding" as defined by 28 U. S. C. §157(b)(2)(C). As set forth in §157(a), Congress has divided bankruptcy proceedings into three categories: those that "aris[e] under title 11"; those that "aris[e] in" a Title 11 case; and those that are "related to a case under title 11." District courts may refer all such proceedings to the bankruptcy judges of their district, and bankruptcy courts may enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." §§157(a), (b)(1). In non-core proceedings, by contrast, a bankruptcy judge may only "submit proposed findings of fact and conclusions of law to the district court." §157(c)(1). Section 157(b)(2) lists 16 categories of core proceedings, including "counterclaims by the estate against persons filing claims against the estate." §157(b)(2)(C).

The Bankruptcy Court concluded that Vickie's counterclaim was a core proceeding. The District Court reversed, reading this Court's precedent in *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, to "suggest[ ] that it would be unconstitutional to hold that any and all counterclaims are core." The court held that Vickie's counterclaim was not core because it was only somewhat related to Pierce's claim, and it accordingly treated the Bankruptcy Court's judgment as proposed, not final. Although the Texas state court had by that time conducted a jury trial on the merits of the parties' dispute and entered a judgment in Pierce's favor, the District Court went on to decide the matter itself, in Vickie's favor. The Court of Appeals ultimately reversed. It held that the Bankruptcy Court lacked authority to enter final judgment on Vickie's counterclaim because the claim was not "so closely related to [Pierce's] proof of claim that the resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself." Because that holding made the Texas probate court's judgment the earliest final judgment on matters relevant to the case, the Court of Appeals held that the District Court should have given the state judgment preclusive effect.

*Held:* Although the Bankruptcy Court had the statutory authority to enter judgment on Vickie's counterclaim, it lacked the constitutional authority to do so. Pp. 6–38.

   1. Section 157(b) authorized the Bankruptcy Court to enter final judgment on Vickie's counterclaim. Pp. 8–16.

   (a) The Bankruptcy Court had the statutory authority to enter final judgment on Vickie's counterclaim as a core proceeding under §157(b)(2)(C). Pierce argues that §157(b) authorizes bankruptcy courts to enter final judgments only in those proceedings that are both core and either arise in a Title 11 case or arise under Title 11 it-

self. But that reading necessarily assumes that there is a category of core proceedings that do not arise in a bankruptcy case or under bankruptcy law, and the structure of §157 makes clear that no such category exists. Pp. 8–11.

(b) In the alternative, Pierce argues that the Bankruptcy Court lacked jurisdiction to resolve Vickie's counterclaim because his defamation claim is a "personal injury tort" that the Bankruptcy Court lacked jurisdiction to hear under §157(b)(5). The Court agrees with Vickie that §157(b)(5) is not jurisdictional, and Pierce consented to the Bankruptcy Court's resolution of the defamation claim. The Court is not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such. See generally *Henderson* v. *Shinseki*, 562 U. S. ___; *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500. Section 157(b)(5) does not have the hallmarks of a jurisdictional decree, and the statutory context belies Pierce's claim that it is jurisdictional. Pierce consented to the Bankruptcy Court's resolution of the defamation claim by repeatedly advising that court that he was happy to litigate his claim there. Pp. 12–16.

2. Although §157 allowed the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution did not. Pp. 16–38.

(a) Article III is "an inseparable element of the constitutional system of checks and balances" that "both defines the power and protects the independence of the Judicial Branch." *Northern Pipeline*, 458 U. S., at 58 (plurality opinion). Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges to protect the integrity of judicial decisionmaking.

This is not the first time the Court has faced an Article III challenge to a bankruptcy court's resolution of a debtor's suit. In *Northern Pipeline,* the Court considered whether bankruptcy judges serving under the Bankruptcy Act of 1978—who also lacked the tenure and salary guarantees of Article III—could "constitutionally be vested with jurisdiction to decide [a] state-law contract claim" against an entity that was not otherwise part of the bankruptcy proceedings. *Id.,* at 53, 87, n. 40 (plurality opinion). The plurality in *Northern Pipeline* recognized that there was a category of cases involving "public rights" that Congress could constitutionally assign to "legislative" courts for resolution. A full majority of the Court, while not agreeing on the scope of that exception, concluded that the doctrine did not encompass adjudication of the state law claim at issue in that case, and rejected the debtor's argument that the Bankruptcy Court's exercise of jurisdiction was constitutional because the bankruptcy judge was acting merely as an adjunct of the district court or court of appeals.

*Id.,* at 69–72; see *id.,* at 90–91 (Rehnquist, J., concurring in judgment). After the decision in *Northern Pipeline*, Congress revised the statutes governing bankruptcy jurisdiction and bankruptcy judges. With respect to the "core" proceedings listed in §157(b)(2), however, the bankruptcy courts under the Bankruptcy Amendments and Federal Judgeship Act of 1984 exercise the same powers they wielded under the 1978 Act. The authority exercised by the newly constituted courts over a counterclaim such as Vickie's exceeds the bounds of Article III. Pp. 16–22.

(b) Vickie's counterclaim does not fall within the public rights exception, however defined. The Court has long recognized that, in general, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284. The Court has also recognized that "[a]t the same time there are matters, involving public rights, . . . which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Ibid.* Several previous decisions have contrasted cases within the reach of the public rights exception—those arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments"—and those that are instead matters "of private right, that is, of the liability of one individual to another under the law as defined." *Crowell* v. *Benson*, 285 U. S. 22, 50, 51.

Shortly after *Northern Pipeline*, the Court rejected the limitation of the public rights exception to actions involving the Government as a party. The Court has continued, however, to limit the exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority. In other words, it is still the case that what makes a right "public" rather than private is that the right is integrally related to particular Federal Government action. See *United States* v. *Jicarilla Apache Nation*, 564 U. S. ___, ___–___ (slip op., at 10–11); *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 584; *Commodity Futures Trading Commission* v. *Schor*, 478 U. S. 833, 844, 856.

In *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, the most recent case considering the public rights exception, the Court rejected a bankruptcy trustee's argument that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a noncreditor in a bankruptcy proceeding fell within the exception. Vickie's counter-

claim is similar. It is not a matter that can be pursued only by grace of the other branches, as in *Murray's Lessee*, 18 How., at 284; it does not flow from a federal statutory scheme, as in *Thomas*, 473 U. S., at 584–585; and it is not "completely dependent upon" adjudication of a claim created by federal law, as in *Schor*, 478 U. S., at 856. This case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers the Court has long recognized into mere wishful thinking. Pp. 22–29.

(c) The fact that Pierce filed a proof of claim in the bankruptcy proceedings did not give the Bankruptcy Court the authority to adjudicate Vickie's counterclaim. Initially, Pierce's defamation claim does not affect the nature of Vickie's tortious interference counterclaim as one at common law that simply attempts to augment the bankruptcy estate—the type of claim that, under *Northern Pipeline* and *Granfinanciera*, must be decided by an Article III court. The cases on which Vickie relies, *Katchen* v. *Landy*, 382 U. S. 323, and *Langenkamp* v. *Culp*, 498 U. S. 42 (*per curiam*), are inapposite. *Katchen* permitted a bankruptcy referee to exercise jurisdiction over a trustee's voidable preference claim against a creditor only where there was no question that the referee was required to decide whether there had been a voidable preference in determining whether and to what extent to allow the creditor's claim. The *Katchen* Court "intimate[d] no opinion concerning whether" the bankruptcy referee would have had "summary jurisdiction to adjudicate a demand by the [bankruptcy] trustee for affirmative relief, all of the substantial factual and legal bases for which ha[d] not been disposed of in passing on objections to the [creditor's proof of] claim." 382 U. S., at 333, n. 9. The *per curiam* opinion in *Langenkamp* is to the same effect. In this case, by contrast, the Bankruptcy Court—in order to resolve Vickie's counterclaim—was required to and did make several factual and legal determinations that were not "disposed of in passing on objections" to Pierce's proof of claim. In both *Katchen* and *Langenkamp*, moreover, the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law. Vickie's claim is instead a state tort action that exists without regard to any bankruptcy proceeding. Pp. 29–34.

(d) The bankruptcy courts under the 1984 Act are not "adjuncts" of the district courts. The new bankruptcy courts, like the courts

considered in *Northern Pipeline*, do not "ma[k]e only specialized, narrowly confined factual determinations regarding a particularized area of law" or engage in "statutorily channeled factfinding functions." 458 U. S., at 85 (plurality opinion). Whereas the adjunct agency in *Crowell* v. *Benson* "possessed only a limited power to issue compensation orders . . . [that] could be enforced only by order of the district court," *ibid.*, a bankruptcy court resolving a counterclaim under §157(b)(2)(C) has the power to enter "appropriate orders and judgments"—including final judgments—subject to review only if a party chooses to appeal, see §§157(b)(1), 158(a)–(b). Such a court is an adjunct of no one. Pp. 34–36.

(e) Finally, Vickie and her *amici* predict that restrictions on a bankruptcy court's ability to hear and finally resolve compulsory counterclaims will create significant delays and impose additional costs on the bankruptcy process. It goes without saying that "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *INS* v. *Chadha*, 462 U. S. 919, 944. In addition, the Court is not convinced that the practical consequences of such limitations are as significant as Vickie suggests. The framework Congress adopted in the 1984 Act already contemplates that certain state law matters in bankruptcy cases will be resolved by state courts and district courts, see §§157(c), 1334(c), and the Court does not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the statute. Pp. 36–38.

600 F. 3d 1037, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. SCALIA, J., filed a concurring opinion. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–179

HOWARD K. STERN, EXECUTOR OF THE ESTATE OF VICKIE LYNN MARSHALL, PETITIONER *v.* ELAINE T. MARSHALL, EXECUTRIX OF THE ESTATE OF E. PIERCE MARSHALL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2011]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

This "suit has, in course of time, become so complicated, that . . . no two . . . lawyers can talk about it for five minutes, without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause: innumerable young people have married into it;" and, sadly, the original parties "have died out of it." A "long procession of [judges] has come in and gone out" during that time, and still the suit "drags its weary length before the Court."

Those words were not written about this case, see C. Dickens, Bleak House, in 1 Works of Charles Dickens 4–5 (1891), but they could have been. This is the second time we have had occasion to weigh in on this long-running dispute between Vickie Lynn Marshall and E. Pierce Marshall over the fortune of J. Howard Marshall II, a man believed to have been one of the richest people in Texas. The Marshalls' litigation has worked its way

through state and federal courts in Louisiana, Texas, and California, and two of those courts—a Texas state probate court and the Bankruptcy Court for the Central District of California—have reached contrary decisions on its merits.  The Court of Appeals below held that the Texas state decision controlled, after concluding that the Bankruptcy Court lacked the authority to enter final judgment on a counterclaim that Vickie brought against Pierce in her bankruptcy proceeding.[1]  To determine whether the Court of Appeals was correct in that regard, we must resolve two issues: (1) whether the Bankruptcy Court had the statutory authority under 28 U. S. C. §157(b) to issue a final judgment on Vickie's counterclaim; and (2) if so, whether conferring that authority on the Bankruptcy Court is constitutional.

Although the history of this litigation is complicated, its resolution ultimately turns on very basic principles.  Article III, §1, of the Constitution commands that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  That Article further provides that the judges of those courts shall hold their offices during good behavior, without diminution of salary.  *Ibid.*  Those requirements of Article III were not honored here.  The Bankruptcy Court in this case exercised the judicial power of the United States by entering final judgment on a common law tort claim, even though the judges of such courts enjoy neither tenure during good behavior nor salary protection.  We conclude that, although the Bankruptcy Court had the statutory authority to enter judgment on Vickie's counterclaim, it lacked the constitutional authority to do so.

——————

[1] Because both Vickie and Pierce passed away during this litigation, the parties in this case are Vickie's estate and Pierce's estate.  We continue to refer to them as "Vickie" and "Pierce."

I

Because we have already recounted the facts and procedural history of this case in detail, see *Marshall* v. *Marshall*, 547 U. S. 293, 300–305 (2006), we do not repeat them in full here. Of current relevance are two claims Vickie filed in an attempt to secure half of J. Howard's fortune. Known to the public as Anna Nicole Smith, Vickie was J. Howard's third wife and married him about a year before his death. *Id.,* at 300; see *In re Marshall*, 392 F. 3d 1118, 1122 (CA9 2004). Although J. Howard bestowed on Vickie many monetary and other gifts during their courtship and marriage, he did not include her in his will. 547 U. S., at 300. Before J. Howard passed away, Vickie filed suit in Texas state probate court, asserting that Pierce—J. Howard's younger son—fraudulently induced J. Howard to sign a living trust that did not include her, even though J. Howard meant to give her half his property. Pierce denied any fraudulent activity and defended the validity of J. Howard's trust and, eventually, his will. 392 F. 3d, at 1122–1123, 1125.

After J. Howard's death, Vickie filed a petition for bankruptcy in the Central District of California. Pierce filed a complaint in that bankruptcy proceeding, contending that Vickie had defamed him by inducing her lawyers to tell members of the press that he had engaged in fraud to gain control of his father's assets. 547 U. S., at 300–301; *In re Marshall*, 600 F. 3d 1037, 1043–1044 (CA9 2010). The complaint sought a declaration that Pierce's defamation claim was not dischargeable in the bankruptcy proceedings. *Ibid.*; see 11 U. S. C. §523(a). Pierce subsequently filed a proof of claim for the defamation action, meaning that he sought to recover damages for it from Vickie's bankruptcy estate. See §501(a). Vickie responded to Pierce's initial complaint by asserting truth as a defense to the alleged defamation and by filing a counterclaim for tortious interference with the gift she expected from J.

Howard. As she had in state court, Vickie alleged that
Pierce had wrongfully prevented J. Howard from taking
the legal steps necessary to provide her with half his
property. 547 U. S., at 301.

On November 5, 1999, the Bankruptcy Court issued
an order granting Vickie summary judgment on Pierce's
claim for defamation. On September 27, 2000, after a
bench trial, the Bankruptcy Court issued a judgment
on Vickie's counterclaim in her favor. The court later
awarded Vickie over $400 million in compensatory dam-
ages and $25 million in punitive damages. 600 F. 3d, at
1045; see 253 B. R. 550, 561–562 (Bkrtcy. Ct. CD Cal.
2000); 257 B. R. 35, 39–40 (Bkrtcy. Ct. CD Cal. 2000).

In post-trial proceedings, Pierce argued that the Bank-
ruptcy Court lacked jurisdiction over Vickie's counter-
claim. In particular, Pierce renewed a claim he had made
earlier in the litigation, asserting that the Bankruptcy
Court's authority over the counterclaim was limited be-
cause Vickie's counterclaim was not a "core proceeding"
under 28 U. S. C. §157(b)(2)(C). See 257 B. R., at 39. As
explained below, bankruptcy courts may hear and en-
ter final judgments in "core proceedings" in a bankruptcy
case. In non-core proceedings, the bankruptcy courts
instead submit proposed findings of fact and conclusions of
law to the district court, for that court's review and issu-
ance of final judgment. The Bankruptcy Court in this case
concluded that Vickie's counterclaim was "a core proceed-
ing" under §157(b)(2)(C), and the court therefore had
the "power to enter judgment" on the counterclaim under
§157(b)(1). *Id.*, at 40.

The District Court disagreed. It recognized that
"Vickie's counterclaim for tortious interference falls within
the literal language" of the statute designating certain
proceedings as "core," see §157(b)(2)(C), but understood
this Court's precedent to "suggest[] that it would be un-
constitutional to hold that any and all counterclaims are

core." 264 B. R. 609, 629–630 (CD Cal. 2001) (citing *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 79, n. 31 (1982) (plurality opinion)). The District Court accordingly concluded that a "counterclaim should not be characterized as core" when it "is only somewhat related to the claim against which it is asserted, and when the unique characteristics and context of the counterclaim place it outside of the normal type of set-off or other counterclaims that customarily arise." 264 B. R., at 632.

Because the District Court concluded that Vickie's counterclaim was not core, the court determined that it was required to treat the Bankruptcy Court's judgment as "proposed[,] rather than final," and engage in an "independent review" of the record. *Id.,* at 633; see 28 U. S. C. §157(c)(1). Although the Texas state court had by that time conducted a jury trial on the merits of the parties' dispute and entered a judgment in Pierce's favor, the District Court declined to give that judgment preclusive effect and went on to decide the matter itself. 271 B. R. 858, 862–867 (CD Cal. 2001); see 275 B. R. 5, 56–58 (CD Cal. 2002). Like the Bankruptcy Court, the District Court found that Pierce had tortiously interfered with Vickie's expectancy of a gift from J. Howard. The District Court awarded Vickie compensatory and punitive damages, each in the amount of $44,292,767.33. *Id.,* at 58.

The Court of Appeals reversed the District Court on a different ground, 392 F. 3d, at 1137, and we—in the first visit of the case to this Court—reversed the Court of Appeals on that issue. 547 U. S., at 314–315. On remand from this Court, the Court of Appeals held that §157 mandated "a two-step approach" under which a bankruptcy judge may issue a final judgment in a proceeding only if the matter both "meets Congress' definition of a core proceeding *and* arises under or arises in title 11," the Bankruptcy Code. 600 F. 3d, at 1055. The court also

reasoned that allowing a bankruptcy judge to enter final judgments on all counterclaims raised in bankruptcy proceedings "would certainly run afoul" of this Court's decision in *Northern Pipeline.* 600 F. 3d, at 1057. With those concerns in mind, the court concluded that "a counterclaim under §157(b)(2)(C) is properly a 'core' proceeding 'arising in a case under' the [Bankruptcy] Code only if the counterclaim is so closely related to [a creditor's] proof of claim that the resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself." *Id.,* at 1058 (internal quotation marks omitted; second brackets added). The court ruled that Vickie's counterclaim did not meet that test. *Id.,* at 1059. That holding made "the Texas probate court's judgment . . . the earliest final judgment entered on matters relevant to this proceeding," and therefore the Court of Appeals concluded that the District Court should have "afford[ed] preclusive effect" to the Texas "court's determination of relevant legal and factual issues." *Id.,* at 1064–1065.[2]

We again granted certiorari. 561 U. S. __ (2010).

## II

### A

With certain exceptions not relevant here, the district courts of the United States have "original and exclusive jurisdiction of all cases under title 11." 28 U. S. C. §1334(a). Congress has divided bankruptcy proceedings into three categories: those that "aris[e] under title 11"; those that "aris[e] in" a Title 11 case; and those that are

---

[2] One judge wrote a separate concurring opinion. He concluded that "Vickie's counterclaim . . . [wa]s not a core proceeding, so the Texas probate court judgment preceded the district court judgment and controls." 600 F. 3d, at 1065 (Kleinfeld, J.). The concurring judge also "offer[ed] additional grounds" that he believed required judgment in Pierce's favor. *Ibid.* Pierce presses only one of those additional grounds here; it is discussed below, in Part II–C.

"related to a case under title 11." §157(a). District courts may refer any or all such proceedings to the bankruptcy judges of their district, *ibid.*, which is how the Bankruptcy Court in this case came to preside over Vickie's bankruptcy proceedings. District courts also may withdraw a case or proceeding referred to the bankruptcy court "for cause shown." §157(d). Since Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the 1984 Act), bankruptcy judges for each district have been appointed to 14-year terms by the courts of appeals for the circuits in which their district is located. §152(a)(1).

The manner in which a bankruptcy judge may act on a referred matter depends on the type of proceeding involved. Bankruptcy judges may hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." §157(b)(1). "Core proceedings include, but are not limited to" 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." §157(b)(2)(C).[3] Parties may appeal final judgments of a

————————
[3] In full, §§157(b)(1)–(2) provides:

"(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

"(2) Core proceedings include, but are not limited to—

"(A) matters concerning the administration of the estate;

"(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

"(C) counterclaims by the estate against persons filing claims against the estate;

"(D) orders in respect to obtaining credit;

bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards. See §158(a); Fed. Rule Bkrtcy. Proc. 8013.

When a bankruptcy judge determines that a referred "proceeding . . . is not a core proceeding but . . . is otherwise related to a case under title 11," the judge may only "submit proposed findings of fact and conclusions of law to the district court." §157(c)(1). It is the district court that enters final judgment in such cases after reviewing *de novo* any matter to which a party objects. *Ibid.*

## B

Vickie's counterclaim against Pierce for tortious interference is a "core proceeding" under the plain text of §157(b)(2)(C). That provision specifies that core proceedings include "counterclaims by the estate against persons filing claims against the estate." In past cases, we have suggested that a proceeding's "core" status alone authorizes a bankruptcy judge, as a statutory matter, to enter

_____

"(E) orders to turn over property of the estate;

"(F) proceedings to determine, avoid, or recover preferences;

"(G) motions to terminate, annul, or modify the automatic stay;

"(H) proceedings to determine, avoid, or recover fraudulent conveyances;

"(I) determinations as to the dischargeability of particular debts;

"(J) objections to discharges;

"(K) determinations of the validity, extent, or priority of liens;

"(L) confirmations of plans;

"(M) orders approving the use or lease of property, including the use of cash collateral;

"(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

"(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

"(P) recognition of foreign proceedings and other matters under chapter 15 of title 11."

final judgment in the proceeding. See, *e.g., Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 50 (1989) (explaining that Congress had designated certain actions as "'core proceedings,' which bankruptcy judges may adjudicate and in which they may issue final judgments, if a district court has referred the matter to them" (citations omitted)). We have not directly addressed the question, however, and Pierce argues that a bankruptcy judge may enter final judgment on a core proceeding only if that proceeding also "aris[es] in" a Title 11 case or "aris[es] under" Title 11 itself. Brief for Respondent 51 (internal quotation marks omitted).

Section 157(b)(1) authorizes bankruptcy courts to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." As written, §157(b)(1) is ambiguous. The "arising under" and "arising in" phrases might, as Pierce suggests, be read as referring to a limited category of those core proceedings that are addressed in that section. On the other hand, the phrases might be read as simply describing what core proceedings are: matters arising under Title 11 or in a Title 11 case. In this case the structure and context of §157 contradict Pierce's interpretation of §157(b)(1).

As an initial matter, Pierce's reading of the statute necessarily assumes that there is a category of core proceedings that neither arise under Title 11 nor arise in a Title 11 case. The manner in which the statute delineates the bankruptcy courts' authority, however, makes plain that no such category exists. Section 157(b)(1) authorizes bankruptcy judges to enter final judgments in "core proceedings arising under title 11, or arising in a case under title 11." Section 157(c)(1) instructs bankruptcy judges to instead submit proposed findings in "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." Nowhere does §157 specify what

bankruptcy courts are to do with respect to the category of matters that Pierce posits—core proceedings that do *not* arise under Title 11 or in a Title 11 case. To the contrary, §157(b)(3) only instructs a bankruptcy judge to "determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." Two options. The statute does not suggest that any other distinctions need be made.

Under our reading of the statute, core proceedings are those that arise in a bankruptcy case or under Title 11. The detailed list of core proceedings in §157(b)(2) provides courts with ready examples of such matters. Pierce's reading of §157, in contrast, supposes that some core proceedings will arise in a Title 11 case or under Title 11 and some will not. Under that reading, the statute provides no guidance on how to tell which are which.

We think it significant that Congress failed to provide any framework for identifying or adjudicating the asserted category of core but not "arising" proceedings, given the otherwise detailed provisions governing bankruptcy court authority. It is hard to believe that Congress would go to the trouble of cataloging 16 different types of proceedings that should receive "core" treatment, but then fail to specify how to determine whether those matters arise under Title 11 or in a bankruptcy case if—as Pierce asserts—the latter inquiry is determinative of the bankruptcy court's authority.

Pierce argues that we should treat core matters that arise neither under Title 11 nor in a Title 11 case as proceedings "related to" a Title 11 case. Brief for Respondent 60 (internal quotation marks omitted). We think that a contradiction in terms. It does not make sense to describe a "core" bankruptcy proceeding as merely "related to" the bankruptcy case; oxymoron is not a typical feature of congressional drafting. See *Northern Pipeline*, 458 U. S.,

at 71 (plurality opinion) (distinguishing "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, . . . from the adjudication of state-created private rights"); Collier on Bankruptcy ¶3.02[2], p. 3–26, n. 5 (16th ed. 2010) ("The terms 'non-core' and 'related' are synonymous"); see also *id.,* at 3–26, ("The phraseology of section 157 leads to the conclusion that there is no such thing as a core matter that is 'related to' a case under title 11. Core proceedings are, at most, those that arise in title 11 cases or arise under title 11" (footnote omitted)). And, as already discussed, the statute simply does not provide for a proceeding that is simultaneously core and yet only related to the bankruptcy case. See §157(c)(1) (providing only for "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11").

As we explain in Part III, we agree with Pierce that designating all counterclaims as "core" proceedings raises serious constitutional concerns. Pierce is also correct that we will, where possible, construe federal statutes so as "to avoid serious doubt of their constitutionality." *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833, 841 (1986) (internal quotation marks omitted). But that "canon of construction does not give [us] the prerogative to ignore the legislative will in order to avoid constitutional adjudication." *Ibid.* In this case, we do not think the plain text of §157(b)(2)(C) leaves any room for the canon of avoidance. We would have to "rewrit[e]" the statute, not interpret it, to bypass the constitutional issue §157(b)(2)(C) presents. *Id.,* at 841 (internal quotation marks omitted). That we may not do. We agree with Vickie that §157(b)(2)(C) permits the bankruptcy court to enter a final judgment on her tortious interference counterclaim.

### C

Pierce argues, as another alternative to reaching the constitutional question, that the Bankruptcy Court lacked jurisdiction to enter final judgment on his defamation claim. Section 157(b)(5) provides that "[t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." Pierce asserts that his defamation claim is a "personal injury tort," that the Bankruptcy Court therefore had no jurisdiction over that claim, and that the court therefore necessarily lacked jurisdiction over Vickie's counterclaim as well. Brief for Respondent 65–66.

Vickie objects to Pierce's statutory analysis across the board. To begin, Vickie contends that §157(b)(5) does not address subject matter jurisdiction at all, but simply specifies the venue in which "personal injury tort and wrongful death claims" should be tried. See Reply Brief for Petitioner 16–17, 19; see also Tr. of Oral Arg. 23 (Deputy Solicitor General) (Section "157(b)(5) is in [the United States'] view not jurisdictional"). Given the limited scope of that provision, Vickie argues, a party may waive or forfeit any objections under §157(b)(5), in the same way that a party may waive or forfeit an objection to the bankruptcy court finally resolving a non-core claim. Reply Brief for Petitioner 17–20; see §157(c)(2) (authorizing the district court, "with the consent of all the parties to the proceeding," to refer a "related to" matter to the bankruptcy court for final judgment). Vickie asserts that in this case Pierce consented to the Bankruptcy Court's adjudication of his defamation claim, and forfeited any argument to the contrary, by failing to seek withdrawal of the claim until he had litigated it before the Bankruptcy Court for 27 months. *Id.,* at 20–23. On the merits, Vickie contends that the statutory phrase "personal injury tort

and wrongful death claims" does not include non-physical torts such as defamation. *Id.,* at 25–26.

We need not determine what constitutes a "personal injury tort" in this case because we agree with Vickie that §157(b)(5) is not jurisdictional, and that Pierce consented to the Bankruptcy Court's resolution of his defamation claim.[4] Because "[b]randing a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system," *Henderson* v. *Shinseki*, 562 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 4–5), we are not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such. See generally *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 516 (2006) ("when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character").

––––––––––

[4] Although Pierce suggests that consideration of "the 157(b)(5) issue" would facilitate an "easy" resolution of the case, Tr. of Oral Arg. 47–48, he is mistaken. Had Pierce preserved his argument under that provision, we would have been confronted with several questions on which there is little consensus or precedent. Those issues include: (1) the scope of the phrase "personal injury tort"—a question over which there is at least a three-way divide, see *In re Arnold*, 407 B. R. 849, 851–853 (Bkrtcy. Ct. MDNC 2009); (2) whether, as Vickie argued in the Court of Appeals, the requirement that a personal injury tort claim be "tried" in the district court nonetheless permits the bankruptcy court to resolve the claim short of trial, see Appellee's/Cross-Appellant's Supplemental Brief in No. 02–56002 etc. (CA9), p. 24; see also *In re Dow Corning Corp.*, 215 B. R. 346, 349–351 (Bkrtcy. Ct. ED Mich. 1997) (noting divide over whether, and on what grounds, a bankruptcy court may resolve a claim pretrial); and (3) even if Pierce's defamation claim could be considered only by the District Court, whether the Bankruptcy Court might retain jurisdiction over the counterclaim, cf. *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 514 (2006) ("when a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U. S. C. §1367, over pendent state-law claims"). We express no opinion on any of these issues and simply note that the §157(b)(5) question is not as straightforward as Pierce would have it.

Section 157(b)(5) does not have the hallmarks of a jurisdictional decree. To begin, the statutory text does not refer to either district court or bankruptcy court "jurisdiction," instead addressing only where personal injury tort claims "shall be tried."

The statutory context also belies Pierce's jurisdictional claim. Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. See §§157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction. See §157(c)(2) (parties may consent to entry of final judgment by bankruptcy judge in non-core case). By the same token, §157(b)(5) simply specifies where a particular category of cases should be tried. Pierce does not explain why that statutory limitation may not be similarly waived.

We agree with Vickie that Pierce not only could but did consent to the Bankruptcy Court's resolution of his defamation claim. Before the Bankruptcy Court, Vickie objected to Pierce's proof of claim for defamation, arguing that Pierce's claim was unenforceable and that Pierce should not receive any amount for it. See 29 Court of Appeals Supplemental Excerpts of Record 6031, 6035 (hereinafter Supplemental Record). Vickie also noted that the Bankruptcy Court could defer ruling on her objection, given the litigation posture of Pierce's claim before the Bankruptcy Court. See *id.,* at 6031. Vickie's filing prompted Pierce to advise the Bankruptcy Court that "[a]ll parties are in agreement that the amount of the contingent Proof of Claim filed by [Pierce] shall be determined by the adversary proceedings" that had been commenced in the Bankruptcy Court. 31 Supplemental Record 6801. Pierce asserted that Vickie's objection should be overruled or, alternatively, that any ruling on the objection "should be continued until the resolution of the pending adversary proceeding litigation." *Ibid.* Pierce identifies no point in the record where he argued to the Bankruptcy Court that

it lacked the authority to adjudicate his proof of claim be-
cause the claim sought recompense for a personal injury tort.

Indeed, Pierce apparently did not object to any court
that §157(b)(5) prohibited the Bankruptcy Court from
resolving his defamation claim until over two years—and
several adverse discovery rulings—after he filed that
claim in June 1996. The first filing Pierce cites as rais-
ing that objection is his September 22, 1998 motion to the
District Court to withdraw the reference of the case to the
Bankruptcy Court. See Brief for Respondent 26–27. The
District Court did initially withdraw the reference as
requested, but it then returned the proceeding to the
Bankruptcy Court, observing that Pierce "implicated the
jurisdiction of that bankruptcy court. He chose to be a
party to that litigation." App. 129. Although Pierce had
objected in July 1996 to the Bankruptcy Court's exercise of
jurisdiction over Vickie's counterclaim, he advised the
court at that time that he was "happy to litigate [his]
claim" there. 29 Supplemental Record 6101. Counsel
stated that even though Pierce thought it was "probably
cheaper for th[e] estate if [Pierce's claim] were sent back
or joined back with the State Court litigation," Pierce "did
choose" the Bankruptcy Court forum and "would be more
than pleased to do it [t]here." *Id.,* at 6101–6102; see also
App. to Pet. for Cert. 266, n. 17 (District Court referring to
these statements).

Given Pierce's course of conduct before the Bankruptcy
Court, we conclude that he consented to that court's reso-
lution of his defamation claim (and forfeited any argument
to the contrary). We have recognized "the value of waiver
and forfeiture rules" in "complex" cases, *Exxon Shipping
Co.* v. *Baker*, 554 U. S. 471, 487–488, n. 6 (2008), and
this case is no exception. In such cases, as here, the
consequences of "a litigant . . . 'sandbagging' the court—
remaining silent about his objection and belatedly raising
the error only if the case does not conclude in his favor,"

*Puckett* v. *United States*, 556 U. S. ___, ___ (2009) (slip op.,
at 5) (some internal quotation marks omitted)—can be
particularly severe.  If Pierce believed that the Bank-
ruptcy Court lacked the authority to decide his claim for
defamation, then he should have said so—and said so
promptly.  See *United States* v. *Olano*, 507 U. S. 725, 731
(1993) ("'No procedural principle is more familiar to this
Court than that a constitutional right,' or a right of any
other sort, 'may be forfeited . . . by the failure to make
timely assertion of the right before a tribunal having
jurisdiction to determine it'" (quoting *Yakus* v. *United
States*, 321 U. S. 414, 444 (1944))).  Instead, Pierce repeat-
edly stated to the Bankruptcy Court that he was happy
to litigate there.  We will not consider his claim to the
contrary, now that he is sad.

                              III

   Although we conclude that §157(b)(2)(C) permits the
Bankruptcy Court to enter final judgment on Vickie's
counterclaim, Article III of the Constitution does not.

                              A

   Article III, §1, of the Constitution mandates that "[t]he
judicial Power of the United States, shall be vested in one
supreme Court, and in such inferior Courts as the Con-
gress may from time to time ordain and establish."  The
same section provides that the judges of those constitu-
tional courts "shall hold their Offices during good Behav-
iour" and "receive for their Services[] a Compensation[]
[that] shall not be diminished" during their tenure.
   As its text and our precedent confirm, Article III is "an
inseparable element of the constitutional system of checks
and balances" that "both defines the power and protects
the independence of the Judicial Branch."  *Northern Pipe-
line*, 458 U. S., at 58 (plurality opinion).  Under "the basic
concept of separation of powers . . . that flow[s] from the

scheme of a tripartite government" adopted in the Constitution, "the 'judicial Power of the United States' . . . can no more be shared" with another branch than "the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto." *United States* v. *Nixon*, 418 U. S. 683, 704 (1974) (quoting U. S. Const., Art. III, §1).

In establishing the system of divided power in the Constitution, the Framers considered it essential that "the judiciary remain[] truly distinct from both the legislature and the executive." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton). As Hamilton put it, quoting Montesquieu, "'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" *Ibid.* (quoting 1 Montesquieu, Spirit of Laws 181).

We have recognized that the three branches are not hermetically sealed from one another, see *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443 (1977), but it remains true that Article III imposes some basic limitations that the other branches may not transgress. Those limitations serve two related purposes. "Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well." *Bond* v. *United States*, 564 U. S. ___, ___ (2011) (slip op., at 10).

Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges. The colonists had been subjected to judicial abuses at the hand of the Crown, and the Framers knew the main reasons why: because the King of Great Britain "made Judges

dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries." The Declaration of Independence ¶11. The Framers undertook in Article III to protect citizens subject to the judicial power of the new Federal Government from a repeat of those abuses. By appointing judges to serve without term limits, and restricting the ability of the other branches to remove judges or diminish their salaries, the Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive, but rather with the "[c]lear heads . . . and honest hearts" deemed "essential to good judges." 1 Works of James Wilson 363 (J. Andrews ed. 1896).

Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's "judicial Power" on entities outside Article III. That is why we have long recognized that, in general, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856). When a suit is made of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *Northern Pipeline*, 458 U. S., at 90 (Rehnquist, J., concurring in judgment), and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job—resolution of "the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law"—to the Judiciary. *Id.,* at 86–87, n. 39 (plurality opinion).

## B

This is not the first time we have faced an Article III challenge to a bankruptcy court's resolution of a debtor's suit. In *Northern Pipeline,* we considered whether bankruptcy judges serving under the Bankruptcy Act of 1978—appointed by the President and confirmed by the Senate, but lacking the tenure and salary guarantees of Article III—could "constitutionally be vested with jurisdiction to decide [a] state-law contract claim" against an entity that was not otherwise part of the bankruptcy proceedings. 458 U. S., at 53, 87, n. 40 (plurality opinion); see *id.,* at 89–92 (Rehnquist, J., concurring in judgment). The Court concluded that assignment of such state law claims for resolution by those judges "violates Art. III of the Constitution." *Id.,* at 52, 87 (plurality opinion); *id.,* at 91 (Rehnquist, J., concurring in judgment).

The plurality in *Northern Pipeline* recognized that there was a category of cases involving "public rights" that Congress could constitutionally assign to "legislative" courts for resolution. That opinion concluded that this "public rights" exception extended "only to matters arising between" individuals and the Government "in connection with the performance of the constitutional functions of the executive or legislative departments . . . that historically could have been determined exclusively by those" branches. *Id.,* at 67–68 (internal quotation marks omitted). A full majority of the Court, while not agreeing on the scope of the exception, concluded that the doctrine did not encompass adjudication of the state law claim at issue in that case. *Id.,* at 69–72; see *id.,* at 90–91 (Rehnquist, J., concurring in judgment) ("None of the [previous cases addressing Article III power] has gone so far as to sanction the type of adjudication to which Marathon will be subjected . . . . To whatever extent different powers granted under [the 1978] Act might be sustained under the 'public rights' doctrine of *Murray's Lessee* . . . and succeeding

cases, I am satisfied that the adjudication of Northern's lawsuit cannot be so sustained").[5]

A full majority of Justices in *Northern Pipeline* also rejected the debtor's argument that the bankruptcy court's exercise of jurisdiction was constitutional because the bankruptcy judge was acting merely as an adjunct of the district court or court of appeals. *Id.,* at 71–72, 81–86 (plurality opinion); *id.,* at 91 (Rehnquist, J., concurring in judgment) ("the bankruptcy court is not an 'adjunct' of either the district court or the court of appeals").

After our decision in *Northern Pipeline*, Congress revised the statutes governing bankruptcy jurisdiction and bankruptcy judges. In the 1984 Act, Congress provided that the judges of the new bankruptcy courts would be appointed by the courts of appeals for the circuits in which their districts are located. 28 U. S. C. §152(a). And, as we have explained, Congress permitted the newly constituted bankruptcy courts to enter final judgments only in "core" proceedings. See *supra,* at 7–8.

With respect to such "core" matters, however, the bankruptcy courts under the 1984 Act exercise the same powers they wielded under the Bankruptcy Act of 1978 (1978 Act), 92 Stat. 2549. As in *Northern Pipeline,* for example, the newly constituted bankruptcy courts are charged under §157(b)(2)(C) with resolving "[a]ll matters of fact and law in whatever domains of the law to which" a counterclaim may lead. 458 U. S., at 91 (Rehnquist, J., concurring in judgment); see, *e.g.,* 275 B. R., at 50–51 (noting that Vickie's counterclaim required the bankruptcy court to determine whether Texas recognized a cause of action for tortious interference with an *inter vivos* gift— something the Supreme Court of Texas had yet to do). As

---

[5] The dissent is thus wrong in suggesting that less than a full Court agreed on the points pertinent to this case. *Post,* at 2 (opinion of BREYER, J.).

in *Northern Pipeline*, the new courts in core proceedings "issue final judgments, which are binding and enforceable even in the absence of an appeal." 458 U. S., at 85–86 (plurality opinion). And, as in *Northern Pipeline*, the district courts review the judgments of the bankruptcy courts in core proceedings only under the usual limited appellate standards. That requires marked deference to, among other things, the bankruptcy judges' findings of fact. See §158(a); Fed. Rule Bkrtcy. Proc. 8013 (findings of fact "shall not be set aside unless clearly erroneous").

C

Vickie and the dissent argue that the Bankruptcy Court's entry of final judgment on her state common law counterclaim was constitutional, despite the similarities between the bankruptcy courts under the 1978 Act and those exercising core jurisdiction under the 1984 Act. We disagree. It is clear that the Bankruptcy Court in this case exercised the "judicial Power of the United States" in purporting to resolve and enter final judgment on a state common law claim, just as the court did in *Northern Pipeline*. No "public right" exception excuses the failure to comply with Article III in doing so, any more than in *Northern Pipeline*. Vickie argues that this case is different because the defendant is a creditor in the bankruptcy. But the debtors' claims in the cases on which she relies were themselves federal claims under bankruptcy law, which would be completely resolved in the bankruptcy process of allowing or disallowing claims. Here Vickie's claim is a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy. *Northern Pipeline* and our subsequent decision in *Granfinanciera,* 492 U. S. 33, rejected the application of the "public rights" exception in such cases.

Nor can the bankruptcy courts under the 1984 Act be

dismissed as mere adjuncts of Article III courts, any more than could the bankruptcy courts under the 1978 Act. The judicial powers the courts exercise in cases such as this remain the same, and a court exercising such broad powers is no mere adjunct of anyone.

1

Vickie's counterclaim cannot be deemed a matter of "public right" that can be decided outside the Judicial Branch. As explained above, in *Northern Pipeline* we rejected the argument that the public rights doctrine permitted a bankruptcy court to adjudicate a state law suit brought by a debtor against a company that had not filed a claim against the estate. See 458 U. S., at 69–72 (plurality opinion); *id.,* at 90–91 (Rehnquist, J., concurring in judgment). Although our discussion of the public rights exception since that time has not been entirely consistent, and the exception has been the subject of some debate, this case does not fall within any of the various formulations of the concept that appear in this Court's opinions.

We first recognized the category of public rights in *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856). That case involved the Treasury Department's sale of property belonging to a customs collector who had failed to transfer payments to the Federal Government that he had collected on its behalf. *Id.,* at 274, 275. The plaintiff, who claimed title to the same land through a different transfer, objected that the Treasury Department's calculation of the deficiency and sale of the property was void, because it was a judicial act that could not be assigned to the Executive under Article III. *Id.,* at 274–275, 282–283.

"To avoid misconstruction upon so grave a subject," the Court laid out the principles guiding its analysis. *Id.,* at 284. It confirmed that Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is

the subject of a suit at the common law, or in equity, or admiralty." *Ibid.* The Court also recognized that "[a]t the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Ibid.*

As an example of such matters, the Court referred to "[e]quitable claims to land by the inhabitants of ceded territories" and cited cases in which land issues were conclusively resolved by Executive Branch officials. *Ibid.* (citing *Foley* v. *Harrison*, 15 How. 433 (1854); *Burgess* v. *Gray*, 16 How. 48 (1854)). In those cases "it depends upon the will of congress whether a remedy in the courts shall be allowed at all," so Congress could limit the extent to which a judicial forum was available. *Murray's Lessee*, 18 How., at 284. The challenge in *Murray's Lessee* to the Treasury Department's sale of the collector's land likewise fell within the "public rights" category of cases, because it could only be brought if the Federal Government chose to allow it by waiving sovereign immunity. *Id.,* at 283–284. The point of *Murray's Lessee* was simply that Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all.

Subsequent decisions from this Court contrasted cases within the reach of the public rights exception—those arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments"—and those that were instead matters "of private right, that is, of the liability of one individual to another under the law as defined." *Crowell* v. *Benson*, 285 U. S. 22, 50, 51 (1932).[6] See *Atlas Roofing Co.* v. *Occupa-*

--------

[6] Although the Court in *Crowell* went on to decide that the facts of the

*tional Safety and Health Review Comm'n*, 430 U. S. 442, 458 (1977) (Exception extends to cases "where the Government is involved in its sovereign capacity under . . . [a] statute creating enforceable public rights," while "[w]holly private tort, contract, and property cases, as well as a vast range of other cases . . . are not at all implicated"); *Ex parte Bakelite Corp.*, 279 U. S. 438, 451–452 (1929). See also *Northern Pipeline, supra,* at 68 (plurality opinion) (citing *Ex parte Bakelite Corp.* for the proposition that the doctrine extended "only to matters that historically could have been determined exclusively by" the Executive and Legislative Branches).

Shortly after *Northern Pipeline*, the Court rejected the

--------

private dispute before it could be determined by a non-Article III tribunal in the first instance, subject to judicial review, the Court did so only after observing that the administrative adjudicator had only limited authority to make specialized, narrowly confined factual determinations regarding a particularized area of law and to issue orders that could be enforced only by action of the District Court. 285 U. S., at 38, 44–45, 54; see *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 78 (1982) (plurality opinion). In other words, the agency in *Crowell* functioned as a true "adjunct" of the District Court. That is not the case here. See *infra*, at 34–36.

Although the dissent suggests that we understate the import of *Crowell* in this regard, the dissent itself recognizes—repeatedly—that *Crowell* by its terms addresses the determination of *facts* outside Article III. See *post*, at 4 (*Crowell* "upheld Congress' delegation of primary factfinding authority to the agency"); *post,* at 12 (quoting *Crowell*, 285 U. S., at 51, for the proposition that "'there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges'"). *Crowell* may well have additional significance in the context of expert administrative agencies that oversee particular substantive federal regimes, but we have no occasion to and do not address those issues today. See *infra,* at 29. The United States apparently agrees that any broader significance of *Crowell* is not pertinent in this case, citing to *Crowell* in its brief only once, in the last footnote, again for the limited proposition discussed above. Brief for United States as *Amicus Curiae* 32, n. 5.

limitation of the public rights exception to actions involving the Government as a party. The Court has continued, however, to limit the exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority. In other words, it is still the case that what makes a right "public" rather than private is that the right is integrally related to particular federal government action. See *United States* v. *Jicarilla Apache Nation*, 564 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 10–11) ("The distinction between 'public rights' against the Government and 'private rights' between private parties is well established," citing *Murray's Lessee* and *Crowell*).

Our decision in *Thomas* v. *Union Carbide Agricultural Products Co.*, for example, involved a data-sharing arrangement between companies under a federal statute providing that disputes about compensation between the companies would be decided by binding arbitration. 473 U. S. 568, 571–575 (1985). This Court held that the scheme did not violate Article III, explaining that "[a]ny right to compensation . . . results from [the statute] and does not depend on or replace a right to such compensation under state law." *Id.,* at 584.

*Commodity Futures Trading Commission* v. *Schor* concerned a statutory scheme that created a procedure for customers injured by a broker's violation of the federal commodities law to seek reparations from the broker before the Commodity Futures Trading Commission (CFTC). 478 U. S. 833, 836 (1986). A customer filed such a claim to recover a debit balance in his account, while the broker filed a lawsuit in Federal District Court to recover the same amount as lawfully due from the customer. The broker later submitted its claim to the CFTC, but after that agency ruled against the customer, the customer

argued that agency jurisdiction over the broker's counter-claim violated Article III. *Id.,* at 837–838. This Court disagreed, but only after observing that (1) the claim and the counterclaim concerned a "single dispute"—the same account balance; (2) the CFTC's assertion of authority involved only "a narrow class of common law claims" in a "'particularized area of law'"; (3) the area of law in question was governed by "a specific and limited federal regulatory scheme" as to which the agency had "obvious expertise"; (4) the parties had freely elected to resolve their differences before the CFTC; and (5) CFTC orders were "enforceable only by order of the district court." *Id.,* at 844, 852–855 (quoting *Northern Pipeline*, 458 U. S., at 85); see 478 U. S., at 843–844; 849–857. Most signifi-cantly, given that the customer's reparations claim before the agency and the broker's counterclaim were competing claims to the same amount, the Court repeatedly empha-sized that it was "necessary" to allow the agency to exer-cise jurisdiction over the broker's claim, or else "the reparations procedure would have been confounded." *Id.,* at 856.

The most recent case in which we considered application of the public rights exception—and the only case in which we have considered that doctrine in the bankruptcy con-text since *Northern Pipeline*—is *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989). In *Granfinanciera* we rejected a bankruptcy trustee's argument that a fraudu-lent conveyance action filed on behalf of a bankruptcy estate against a noncreditor in a bankruptcy proceeding fell within the "public rights" exception. We explained that, "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." *Id.,* at 54–55. We reasoned that fraudu-lent conveyance suits were "quintessentially suits at com-

mon law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Id.,* at 56. As a consequence, we concluded that fraudulent conveyance actions were "more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions." *Id.,* at 55.[7]

Vickie's counterclaim—like the fraudulent conveyance claim at issue in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception in this Court's cases. It is not a matter that can be pursued only by grace of the other branches, as in *Murray's Lessee,* 18 How., at 284, or one that "historically could have been determined exclusively by" those branches, *Northern Pipeline, supra,* at 68 (citing *Ex parte Bakelite Corp.*, 279 U. S., at 458). The claim is instead one under state common law between two private parties. It does not "depend[] on the will of congress," *Murray's Lessee, supra,* at 284; Congress has nothing to do with it.

In addition, Vickie's claimed right to relief does not flow from a federal statutory scheme, as in *Thomas*, 473 U. S., at 584–585, or *Atlas Roofing*, 430 U. S., at 458. It is not "completely dependent upon" adjudication of a claim created by federal law, as in *Schor*, 478 U. S., at 856. And in contrast to the objecting party in *Schor, id.,* at 855–856, Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings. He had nowhere else to go if he wished to recover from Vickie's estate. See

———————
[7] We noted that we did not mean to "suggest that the restructuring of debtor-creditor relations is in fact a public right." 492 U. S., at 56, n. 11. Our conclusion was that, "even if one accepts this thesis," Congress could not constitutionally assign resolution of the fraudulent conveyance action to a non-Article III court. *Ibid.* Because neither party asks us to reconsider the public rights framework for bankruptcy, we follow the same approach here.

*Granfinanciera, supra,* at 59, n. 14 (noting that "[p]arallel reasoning [to *Schor*] is unavailable in the context of bankruptcy proceedings, because creditors lack an alternative forum to the bankruptcy court in which to pursue their claims").[8]

Furthermore, the asserted authority to decide Vickie's claim is not limited to a "particularized area of the law," as in *Crowell*, *Thomas*, and *Schor*. *Northern Pipeline*, 458 U. S., at 85 (plurality opinion). We deal here not with an agency but with a court, with substantive jurisdiction reaching any area of the *corpus juris*. See *ibid.*; *id.,* at 91 (Rehnquist, J., concurring in judgment). This is not a situation in which Congress devised an "expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by an administrative agency specially assigned to that task." *Crowell*, 285 U. S., at 46; see *Schor*, *supra,* at 855–856. The "experts" in the federal system at resolving common law counterclaims such as Vickie's are the Article III courts, and it is with those courts that her claim must stay.

The dissent reads our cases differently, and in particular contends that more recent cases view *Northern Pipeline* as "'establish[ing] only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of

─────────

[8] Contrary to the claims of the dissent, see *post,* at 12–13, Pierce did not have another forum in which to pursue his claim to recover from Vickie's pre-bankruptcy assets, rather than take his chances with whatever funds might remain after the Title 11 proceedings. Creditors who possess claims that do not satisfy the requirements for nondischargeability under 11 U. S. C. §523 have no choice but to file their claims in bankruptcy proceedings if they want to pursue the claims at all. That is why, as we recognized in *Granfinanciera*, the notion of "consent" does not apply in bankruptcy proceedings as it might in other contexts.

the litigants, and subject only to ordinary appellate review.'" *Post,* at 6 (quoting *Thomas, supra,* at 584). Just so: Substitute "tort" for "contract," and that statement directly covers this case.

We recognize that there may be instances in which the distinction between public and private rights—at least as framed by some of our recent cases—fails to provide concrete guidance as to whether, for example, a particular agency can adjudicate legal issues under a substantive regulatory scheme. Given the extent to which this case is so markedly distinct from the agency cases discussing the public rights exception in the context of such a regime, however, we do not in this opinion express any view on how the doctrine might apply in that different context.

What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking.

2

Vickie and the dissent next attempt to distinguish *Northern Pipeline* and *Granfinanciera* on the ground that Pierce, unlike the defendants in those cases, had filed a proof of claim in the bankruptcy proceedings. Given Pierce's participation in those proceedings, Vickie argues, the Bankruptcy Court had the authority to adjudicate her counterclaim under our decisions in *Katchen* v. *Landy*, 382 U. S. 323 (1966), and *Langenkamp* v. *Culp*, 498 U. S. 42 (1990) (*per curiam*).

We do not agree. As an initial matter, it is hard to see why Pierce's decision to file a claim should make any difference with respect to the characterization of Vickie's counterclaim. "'[P]roperty interests are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Travelers Casualty & Surety Co. of America* v. *Pacific Gas & Elec. Co.*, 549 U. S. 443, 451 (2007) (quoting *Butner* v. *United States*, 440 U. S. 48, 55 (1979)). Pierce's claim for defamation in no way affects the nature of Vickie's counterclaim for tortious interference as one at common law that simply attempts to augment the bankruptcy estate— the very type of claim that we held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court.

Contrary to Vickie's contention, moreover, our decisions in *Katchen* and *Langenkamp* do not suggest a different result. *Katchen* permitted a bankruptcy referee acting under the Bankruptcy Acts of 1898 and 1938 (akin to a bankruptcy court today) to exercise what was known as "summary jurisdiction" over a voidable preference claim brought by the bankruptcy trustee against a creditor who had filed a proof of claim in the bankruptcy proceeding. See 382 U. S., at 325, 327–328. A voidable preference claim asserts that a debtor made a payment to a particular creditor in anticipation of bankruptcy, to in effect increase that creditor's proportionate share of the estate. The preferred creditor's claim in bankruptcy can be disallowed as a result of the preference, and the amounts paid to that creditor can be recovered by the trustee. See *id.,* at 330; see also 11 U. S. C. §§502(d), 547(b).

Although the creditor in *Katchen* objected that the preference issue should be resolved through a "plenary suit" in an Article III court, this Court concluded that summary adjudication in bankruptcy was appropriate,

because it was not possible for the referee to rule on the creditor's proof of claim without first resolving the voidable preference issue. 382 U. S., at 329–330, 332–333, and n. 9, 334. There was no question that the bankruptcy referee could decide whether there had been a voidable preference in determining whether and to what extent to allow the creditor's claim. Once the referee did that, "nothing remains for adjudication in a plenary suit"; such a suit "would be a meaningless gesture." *Id.,* at 334. The plenary proceeding the creditor sought could be brought into the bankruptcy court because "the same issue [arose] as part of the process of allowance and disallowance of claims." *Id.,* at 336.

It was in that sense that the Court stated that "he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure." *Id.,* at 333, n. 9. In *Katchen* one of those consequences was resolution of the preference issue as part of the process of allowing or disallowing claims, and accordingly there was no basis for the creditor to insist that the issue be resolved in an Article III court. See *id.,* at 334. Indeed, the *Katchen* Court expressly noted that it "intimate[d] no opinion concerning whether" the bankruptcy referee would have had "summary jurisdiction to adjudicate a demand by the [bankruptcy] trustee for affirmative relief, all of the substantial factual and legal bases for which ha[d] not been disposed of in passing on objections to the [creditor's proof of] claim." *Id.,* at 333, n. 9.

Our *per curiam* opinion in *Langenkamp* is to the same effect. We explained there that a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* "the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship." 498 U. S., at 44. If, in contrast, the creditor has not filed a

proof of claim, the trustee's preference action does *not* "become[] part of the claims-allowance process" subject to resolution by the bankruptcy court. *Ibid.*; see *id.,* at 45.

In ruling on Vickie's counterclaim, the Bankruptcy Court was required to and did make several factual and legal determinations that were not "disposed of in passing on objections" to Pierce's proof of claim for defamation, which the court had denied almost a year earlier. *Katchen*, *supra,* at 332, n. 9. There was some overlap between Vickie's counterclaim and Pierce's defamation claim that led the courts below to conclude that the counterclaim was compulsory, 600 F. 3d, at 1057, or at least in an "attenuated" sense related to Pierce's claim, 264 B. R., at 631. But there was never any reason to believe that the process of adjudicating Pierce's proof of claim would necessarily resolve Vickie's counterclaim. See *id.,* at 631, 632 (explaining that "the primary facts at issue on Pierce's claim were the relationship between Vickie and her attorneys and her knowledge or approval of their statements," and "the counterclaim raises issues of law entirely different from those raise[d] on the defamation claim"). The United States acknowledges the point. See Brief for United States as *Amicus Curiae,* p. (I) (question presented concerns authority of a bankruptcy court to enter final judgment on a compulsory counterclaim "when adjudication of the counterclaim requires resolution of issues that are not implicated by the claim against the estate"); *id.,* at 26.

The only overlap between the two claims in this case was the question whether Pierce had in fact tortiously taken control of his father's estate in the manner alleged by Vickie in her counterclaim and described in the allegedly defamatory statements. From the outset, it was clear that, even assuming the Bankruptcy Court would (as it did) rule in Vickie's favor on that question, the court could not enter judgment for Vickie unless the court additionally

ruled on the questions whether Texas recognized tortious interference with an expected gift as a valid cause of action, what the elements of that action were, and whether those elements were met in this case. 275 B. R., at 50–53. Assuming Texas accepted the elements adopted by other jurisdictions, that meant Vickie would need to prove, above and beyond Pierce's tortious interference, (1) the existence of an expectancy of a gift; (2) a reasonable certainty that the expectancy would have been realized but for the interference; and (3) damages. *Id.,* at 51; see 253 B. R., at 558–561. Also, because Vickie sought punitive damages in connection with her counterclaim, the Bankruptcy Court could not finally dispose of the case in Vickie's favor without determining whether to subject Pierce to the sort of "retribution," "punishment[,] and deterrence," *Exxon Shipping Co.*, 554 U. S., at 492, 504 (internal quotation marks omitted), those damages are designed to impose. There thus was never reason to believe that the process of ruling on Pierce's proof of claim would necessarily result in the resolution of Vickie's counterclaim.

In both *Katchen* and *Langenkamp*, moreover, the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law. In *Langenkamp*, we noted that "the trustee instituted adversary proceedings under 11 U. S. C. §547(b) to recover, as avoidable preferences," payments respondents received from the debtor before the bankruptcy filings. 498 U. S., at 43; see, *e.g.,* §547(b)(1) ("the trustee may avoid any transfer of an interest of the debtor in property—(1) to or for the benefit of a creditor"). In *Katchen*, "[t]he Trustee . . . [asserted] that the payments made [to the creditor] were preferences inhibited by Section 60a of the Bankruptcy Act." Memorandum Opinion (Feb. 8, 1963), Tr. of Record in O. T. 1965, No. 28, p. 3; see 382 U. S., at 334 (considering impact of the claims allowance process on "action by the

trustee under §60 to recover the preference"); 11 U. S. C. §96(b) (1964 ed.) (§60(b) of the then-applicable Bankruptcy Act) ("preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby . . . has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent"). Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.

In light of all the foregoing, we disagree with the dissent that there are no "relevant distinction[s]" between Pierce's claim in this case and the claim at issue in *Langenkamp*. *Post*, at 14. We see no reason to treat Vickie's counterclaim any differently from the fraudulent conveyance action in *Granfinanciera*. 492 U. S., at 56. *Granfinanciera*'s distinction between actions that seek "to augment the bankruptcy estate" and those that seek "a pro rata share of the bankruptcy res," *ibid.*, reaffirms that Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. Vickie has failed to demonstrate that her counterclaim falls within one of the "limited circumstances" covered by the public rights exception, particularly given our conclusion that, "even with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Art. III courts." *Northern Pipeline,* 458 U. S., at 69, n. 23, 77, n. 29 (plurality opinion).

3

Vickie additionally argues that the Bankruptcy Court's final judgment was constitutional because bankruptcy courts under the 1984 Act are properly deemed "adjuncts" of the district courts. Brief for Petitioner 61–64. We

rejected a similar argument in *Northern Pipeline*, see 458 U. S., at 84–86 (plurality opinion); *id.,* at 91 (Rehnquist, J., concurring in judgment), and our reasoning there holds true today.

To begin, as explained above, it is still the bankruptcy court itself that exercises the essential attributes of judicial power over a matter such as Vickie's counterclaim. See *supra,* at 20. The new bankruptcy courts, like the old, do not "ma[k]e only specialized, narrowly confined factual determinations regarding a particularized area of law" or engage in "statutorily channeled factfinding functions." *Northern Pipeline*, 458 U. S., at 85 (plurality opinion). Instead, bankruptcy courts under the 1984 Act resolve "[a]ll matters of fact and law in whatever domains of the law to which" the parties' counterclaims might lead. *Id.,* at 91 (Rehnquist, J., concurring in judgment).

In addition, whereas the adjunct agency in *Crowell* v. *Benson* "possessed only a limited power to issue compensation orders . . . [that] could be enforced only by order of the district court," *Northern Pipeline, supra,* at 85, a bankruptcy court resolving a counterclaim under 28 U. S. C. §157(b)(2)(C) has the power to enter "appropriate orders and judgments"—including final judgments—subject to review only if a party chooses to appeal, see §§157(b)(1), 158(a)–(b). It is thus no less the case here than it was in *Northern Pipeline* that "[t]he authority—and the responsibility—to make an informed, final determination . . . remains with" the bankruptcy judge, not the district court. 458 U. S., at 81 (plurality opinion) (internal quotation marks omitted). Given that authority, a bankruptcy court can no more be deemed a mere "adjunct" of the district court than a district court can be deemed such an "adjunct" of the court of appeals. We certainly cannot accept the dissent's notion that judges who have the power to enter final, binding orders are the "functional[]" equivalent of "law clerks[] and the Judiciary's administrative

officials." *Post*, at 11. And even were we wrong in this regard, that would only confirm that such judges should not be in the business of entering final judgments in the first place.

It does not affect our analysis that, as Vickie notes, bankruptcy judges under the current Act are appointed by the Article III courts, rather than the President. See Brief for Petitioner 59. If—as we have concluded—the bankruptcy court itself exercises "the essential attributes of judicial power [that] are reserved to Article III courts," *Schor*, 478 U. S., at 851 (internal quotation marks omitted), it does not matter who appointed the bankruptcy judge or authorized the judge to render final judgments in such proceedings. The constitutional bar remains. See The Federalist No. 78, at 471 ("Periodical appointments, however regulated, or by whomsoever made, would, in some way or other, be fatal to [a judge's] necessary independence").

D

Finally, Vickie and her *amici* predict as a practical matter that restrictions on a bankruptcy court's ability to hear and finally resolve compulsory counterclaims will create significant delays and impose additional costs on the bankruptcy process. See, *e.g.,* Brief for Petitioner 34–36, 57–58; Brief for United States as *Amicus Curiae* 29–30. It goes without saying that "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *INS* v. *Chadha*, 462 U. S. 919, 944 (1983).

In addition, we are not convinced that the practical consequences of such limitations on the authority of bankruptcy courts to enter final judgments are as significant as Vickie and the dissent suggest. See *post*, at 16–17. The dissent asserts that it is important that counterclaims such as Vickie's be resolved "in a bankruptcy court," and

that, "to be effective, a single tribunal must have broad authority to restructure [debtor-creditor] relations." *Post*, at 14, 15 (emphasis deleted). But the framework Congress adopted in the 1984 Act already contemplates that certain state law matters in bankruptcy cases will be resolved by judges other than those of the bankruptcy courts. Section 1334(c)(2), for example, requires that bankruptcy courts abstain from hearing specified non-core, state law claims that "can be timely adjudicated[] in a State forum of appropriate jurisdiction." Section 1334(c)(1) similarly provides that bankruptcy courts may abstain from hearing any proceeding, including core matters, "in the interest of comity with State courts or respect for State law."

As described above, the current bankruptcy system also requires the district court to review *de novo* and enter final judgment on any matters that are "related to" the bankruptcy proceedings, §157(c)(1), and permits the district court to withdraw from the bankruptcy court any referred case, proceeding, or part thereof, §157(d). Pierce has not argued that the bankruptcy courts "are barred from 'hearing' all counterclaims" or proposing findings of fact and conclusions of law on those matters, but rather that it must be the district court that "finally decide[s]" them. Brief for Respondent 61. We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a "narrow" one. Brief for United States as *Amicus Curiae* 23.

If our decision today does not change all that much, then why the fuss? Is there really a threat to the separation of powers where Congress has conferred the judicial power outside Article III only over certain counterclaims in bankruptcy? The short but emphatic answer is yes. A statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely.

"Slight encroachments create new boundaries from which legions of power can seek new territory to capture." *Reid* v. *Covert*, 354 U. S. 1, 39 (1957) (plurality opinion). Although "[i]t may be that it is the obnoxious thing in its mildest and least repulsive form," we cannot overlook the intrusion: "illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." *Boyd* v. *United States*, 116 U. S. 616, 635 (1886). We cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system, even with respect to challenges that may seem innocuous at first blush.

\* \* \*

Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 10–179

HOWARD K. STERN, EXECUTOR OF THE ESTATE OF VICKIE LYNN MARSHALL, PETITIONER *v.* ELAINE T. MARSHALL, EXECUTRIX OF THE ESTATE OF E. PIERCE MARSHALL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2011]

JUSTICE SCALIA, concurring.

I agree with the Court's interpretation of our Article III precedents, and I accordingly join its opinion. I adhere to my view, however, that—our contrary precedents notwithstanding—"a matter of public rights . . . must at a minimum arise between the government and others," *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 65 (1989) (SCALIA, J., concurring in part and concurring in judgment) (internal quotation marks omitted).

The sheer surfeit of factors that the Court was required to consider in this case should arouse the suspicion that something is seriously amiss with our jurisprudence in this area. I count at least seven different reasons given in the Court's opinion for concluding that an Article III judge was required to adjudicate this lawsuit: that it was one "under state common law" which was "not a matter that can be pursued only by grace of the other branches," *ante,* at 27; that it was "not 'completely dependent upon' adjudication of a claim created by federal law," *ibid.;* that "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings," *ibid.;* that "the asserted authority to decide Vickie's claim is not limited to a 'particularized area of the law,'" *ante,* at 28; that "there was

never any reason to believe that the process of adjudicating Pierce's proof of claim would necessarily resolve Vickie's counterclaim," *ante*, at 32; that the trustee was not "asserting a right of recovery created by federal bankruptcy law," *ante*, at 33; and that the Bankruptcy Judge "ha[d] the power to enter 'appropriate orders and judgments'—including final judgments—subject to review only if a party chooses to appeal," *ante*, at 35.

Apart from their sheer numerosity, the more fundamental flaw in the many tests suggested by our jurisprudence is that they have nothing to do with the text or tradition of Article III. For example, Article III gives no indication that state-law claims have preferential entitlement to an Article III judge; nor does it make pertinent the extent to which the area of the law is "particularized." The multifactors relied upon today seem to have entered our jurisprudence almost randomly.

Leaving aside certain adjudications by federal administrative agencies, which are governed (for better or worse) by our landmark decision in *Crowell* v. *Benson*, 285 U. S. 22 (1932), in my view an Article III judge is required in *all* federal adjudications, unless there is a firmly established historical practice to the contrary. For that reason—and not because of some intuitive balancing of benefits and harms—I agree that Article III judges are not required in the context of territorial courts, courts-martial, or true "public rights" cases. See *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 71 (1982) (plurality opinion). Perhaps historical practice permits non-Article III judges to process claims against the bankruptcy estate, see, *e.g.,* Plank, Why Bankruptcy Judges Need Not and Should Not Be Article III Judges, 72 Am. Bankr. L. J. 567, 607–609 (1998); the subject has not been briefed, and so I state no position on the matter. But Vickie points to no historical practice that authorizes a non-Article III judge to adjudicate a counterclaim of the sort at issue here.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–179

_____

### HOWARD K. STERN, EXECUTOR OF THE ESTATE OF VICKIE LYNN MARSHALL, PETITIONER *v.* ELAINE T. MARSHALL, EXECUTRIX OF THE ESTATE OF E. PIERCE MARSHALL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2011]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN, join dissenting.

Pierce Marshall filed a claim in Federal Bankruptcy Court against the estate of Vickie Marshall. His claim asserted that Vickie Marshall had, through her lawyers, accused him of trying to prevent her from obtaining money that his father had wanted her to have; that her accusations violated state defamation law; and that she consequently owed Pierce Marshall damages. Vickie Marshall filed a compulsory counterclaim in which she asserted that Pierce Marshall had unlawfully interfered with her husband's efforts to grant her an *inter vivos* gift and that he consequently owed her damages.

The Bankruptcy Court adjudicated the claim and the counterclaim. In doing so, the court followed statutory procedures applicable to "core" bankruptcy proceedings. See 28 U. S. C. §157(b). And ultimately the Bankruptcy Court entered judgment in favor of Vickie Marshall. The question before us is whether the Bankruptcy Court possessed jurisdiction to adjudicate Vickie Marshall's counterclaim. I agree with the Court that the bankruptcy statute, §157(b)(2)(C), authorizes a bankruptcy court to adjudicate the counterclaim. But I do not agree with the

majority about the statute's constitutionality. I believe the statute is consistent with the Constitution's delegation of the "judicial Power of the United States" to the Judicial Branch of Government. Art. III, §1. Consequently, it is constitutional.

I

My disagreement with the majority's conclusion stems in part from my disagreement about the way in which it interprets, or at least emphasizes, certain precedents. In my view, the majority overstates the current relevance of statements this Court made in an 1856 case, *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856), and it overstates the importance of an analysis that did not command a Court majority in *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982), and that was subsequently disavowed. At the same time, I fear the Court understates the importance of a watershed opinion widely thought to demonstrate the constitutional basis for the current authority of administrative agencies to adjudicate private disputes, namely, *Crowell* v. *Benson*, 285 U. S. 22 (1932). And it fails to follow the analysis that this Court more recently has held applicable to the evaluation of claims of a kind before us here, namely, claims that a congressional delegation of adjudicatory authority violates separation-of-powers principles derived from Article III. See *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568 (1985); *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986).

I shall describe these cases in some detail in order to explain why I believe we should put less weight than does the majority upon the statement in *Murray's Lessee* and the analysis followed by the *Northern Pipeline* plurality and instead should apply the approach this Court has applied in *Crowell*, *Thomas*, and *Schor*.

A

In *Murray's Lessee*, the Court held that the Constitution permitted an executive official, through summary, nonjudicial proceedings, to attach the assets of a customs collector whose account was deficient. The Court found evidence in common law of "summary method[s] for the recovery of debts due to the crown, and especially those due from receivers of the revenues," 18 How., at 277, and it analogized the Government's summary attachment process to the kind of self-help remedies available to private parties, *id.*, at 283. In the course of its opinion, the Court wrote:

> "[W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Id.*, at 284.

The majority reads the first part of the statement's first sentence as authoritatively defining the boundaries of Article III. *Ante*, at 18. I would read the statement in a less absolute way. For one thing, the statement is in effect dictum. For another, it is the remainder of the statement, announcing a distinction between "public rights" and "private rights," that has had the more lasting impact. Later Courts have seized on that distinction when *upholding* non-Article III adjudication, not when striking it down. See *Ex parte Bakelite Corp.*, 279 U. S. 438, 451–452

(1929) (Court of Customs Appeals); *Williams* v. *United States*, 289 U. S. 553, 579–580 (1933) (Court of Claims). The one exception is *Northern Pipeline,* where the Court struck down the Bankruptcy Act of 1978. But in that case there was no majority. And a plurality, not a majority, read the statement roughly in the way the Court does today. See 458 U. S., at 67–70.

### B

At the same time, I believe the majority places insufficient weight on *Crowell*, a seminal case that clarified the scope of the dictum in *Murray's Lessee.* In that case, the Court considered whether Congress could grant to an Article I administrative agency the power to adjudicate an employee's workers' compensation claim against his employer. The Court assumed that an Article III court would review the agency's decision *de novo* in respect to questions of law but it would conduct a less searching review (looking to see only if the agency's award was "supported by evidence in the record") in respect to questions of fact. *Crowell*, 285 U. S., at 48–50. The Court pointed out that the case involved a dispute between private persons (a matter of "private rights") and (with one exception not relevant here) it upheld Congress' delegation of primary factfinding authority to the agency.

Justice Brandeis, dissenting (from a here-irrelevant portion of the Court's holding), wrote that the adjudicatory scheme raised only a due process question: When does due process require decision by an Article III judge? He answered that question by finding constitutional the statute's delegation of adjudicatory authority to an agency. *Id.*, at 87.

*Crowell* has been hailed as "the greatest of the cases validating administrative adjudication." Bator, The Constitution as Architecture: Legislative and Administrative Courts Under Article III, 65 Ind. L. J. 233, 251 (1990).

Yet, in a footnote, the majority distinguishes *Crowell* as a case in which the Court upheld the delegation of adjudicatory authority to an administrative agency simply because the agency's power to make the "specialized, narrowly confined factual determinations" at issue arising in a "particularized area of law," made the agency a "true 'adjunct' of the District Court." *Ante*, at 23, n. 6. Were *Crowell*'s holding as narrow as the majority suggests, one could question the validity of Congress' delegation of authority to adjudicate disputes among private parties to other agencies such as the National Labor Relations Board, the Commodity Futures Trading Commission, the Surface Transportation Board, and the Department of Housing and Urban Development, thereby resurrecting important legal questions previously thought to have been decided. See 29 U. S. C. §160; 7 U. S. C. §18; 49 U. S. C. §10704; 42 U. S. C. §3612(b).

C

The majority, in my view, overemphasizes the precedential effect of the plurality opinion in *Northern Pipeline*. *Ante*, at 19–21. There, the Court held unconstitutional the jurisdictional provisions of the Bankruptcy Act of 1978 granting adjudicatory authority to bankruptcy judges who lack the protections of tenure and compensation that Article III provides. Four Members of the Court wrote that Congress could grant adjudicatory authority to a non-Article III judge only where (1) the judge sits on a "territorial cour[t]" (2) the judge conducts a "courts-martial," or (3) the case involves a "public right," namely, a "matter" that "at a minimum arise[s] 'between the government and others.'" 458 U. S., at 64–70 (plurality opinion) (quoting *Ex parte Bakelite Corp., supra*, at 451). Two other Members of the Court, without accepting these limitations, agreed with the result because the case involved a breach-of-contract claim brought by the bankruptcy trustee on

behalf of the bankruptcy estate against a third party who
was not part of the bankruptcy proceeding, and none of
the Court's preceding cases (which, the two Members
wrote, "do not admit of easy synthesis") had "gone so far as
to sanction th[is] type of adjudication." 458 U. S., at 90–91
(Rehnquist, J. concurring in judgment).

Three years later, the Court held that *Northern Pipeline*

"establishes only that Congress may not vest in a non-
Article III court the power to adjudicate, render final
judgment, and issue binding orders in a traditional
contract action arising under state law, without con-
sent of the litigants, and subject only to ordinary ap-
pellate review." *Thomas*, 473 U. S., at 584.

D

Rather than leaning so heavily on the approach taken
by the plurality in *Northern Pipeline*, I would look to this
Court's more recent Article III cases *Thomas* and *Schor*—
cases that commanded a clear majority. In both cases
the Court took a more pragmatic approach to the constitu-
tional question. It sought to determine whether, in the
particular instance, the challenged delegation of adjudica-
tory authority posed a genuine and serious threat that one
branch of Government sought to aggrandize its own con-
stitutionally delegated authority by encroaching upon a
field of authority that the Constitution assigns exclusively
to another branch.

1

In *Thomas*, the Court focused directly upon the nature
of the Article III problem, illustrating how the Court
should determine whether a delegation of adjudicatory
authority to a non-Article III judge violates the Constitu-
tion. The statute in question required pesticide manufac-
turers to submit to binding arbitration claims for compen-
sation owed for the use by one manufacturer of the data of

another to support its federal pesticide registration. After describing *Northern Pipeline*'s holding in the language I have set forth above, *supra*, at 6, the Court stated that "*practical attention to substance* rather than doctrinaire reliance on formal categories should inform application of Article III." *Thomas*, 473 U. S., at 587 (emphasis added). It indicated that Article III's requirements could not be "determined" by "the identity of the parties alone," *ibid.*, or by the "private rights"/"public rights" distinction, *id.*, at 585–586. And it upheld the arbitration provision of the statute.

The Court pointed out that the right in question was created by a federal statute, it "represent[s] a pragmatic solution to the difficult problem of spreading [certain] costs," and the statute "does not preclude review of the arbitration proceeding by an Article III court." *Id.*, at 589–592. The Court concluded:

> "Given the nature of the right at issue and the concerns motivating the Legislature, we do not think this system threatens the independent role of the Judiciary in our constitutional scheme." *Id.*, at 590.

2

Most recently, in *Schor*, the Court described in greater detail how this Court should analyze this kind of Article III question. The question at issue in *Schor* involved a delegation of authority to an agency to adjudicate a counterclaim. A customer brought before the Commodity Futures Trading Commission (CFTC) a claim for reparations against his commodity futures broker. The customer noted that his brokerage account showed that he owed the broker money, but he said that the broker's unlawful actions had produced that debit balance, and he sought damages. The broker brought a counterclaim seeking the money that the account showed the customer owed. This Court had to decide whether agency adjudication of such a

counterclaim is consistent with Article III.

In doing so, the Court expressly "declined to adopt formalistic and unbending rules." *Schor*, 478 U. S., at 851. Rather, it "weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary." *Ibid.* Those relevant factors include (1) "the origins and importance of the right to be adjudicated"; (2) "the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts"; (3) the extent to which the delegation nonetheless reserves judicial power for exercise by Article III courts; (4) the presence or "absence of consent to an initial adjudication before a non-Article III tribunal"; and (5) "the concerns that drove Congress to depart from" adjudication in an Article III court. *Id.*, at 849, 851.

The Court added that where "private rights," rather than "public rights" are involved, the "danger of encroaching on the judicial powers" is greater. *Id.*, at 853–854 (internal quotation marks omitted). Thus, while non-Article III adjudication of "private rights" is not necessarily unconstitutional, the Court's constitutional "examination" of such a scheme must be more "searching." *Ibid.*

Applying this analysis, the Court upheld the agency's authority to adjudicate the counterclaim. The Court conceded that the adjudication might be of a kind traditionally decided by a court and that the rights at issue were "private," not "public." *Id.*, at 853. But, the Court said, the CFTC deals only with a "'particularized area of law'"; the decision to invoke the CFTC forum is "left entirely to the parties"; Article III courts can review the agency's findings of fact under "the same 'weight of the evidence' standard sustained in *Crowell*" and review its "legal determinations . . . *de novo*"; and the agency's "counterclaim jurisdiction" was necessary to make "workable" a

"reparations procedure," which constitutes an important part of a congressionally enacted "regulatory scheme." *Id.*, at 852–856. The Court concluded that for these and other reasons "the magnitude of any intrusion on the Judicial Branch can only be termed *de minimis.*" *Id.*, at 856.

## II

### A

This case law, as applied in *Thomas* and *Schor*, requires us to determine pragmatically whether a congressional delegation of adjudicatory authority to a non-Article III judge violates the separation-of-powers principles inherent in Article III. That is to say, we must determine through an examination of certain relevant factors whether that delegation constitutes a significant encroachment by the Legislative or Executive Branches of Government upon the realm of authority that Article III reserves for exercise by the Judicial Branch of Government. Those factors include (1) the nature of the claim to be adjudicated; (2) the nature of the non-Article III tribunal; (3) the extent to which Article III courts exercise control over the proceeding; (4) the presence or absence of the parties' consent; and (5) the nature and importance of the legislative purpose served by the grant of adjudicatory authority to a tribunal with judges who lack Article III's tenure and compensation protections. The presence of "private rights" does not automatically determine the outcome of the question but requires a more "searching" examination of the relevant factors. *Schor, supra*, at 854.

Insofar as the majority would apply more formal standards, it simply disregards recent, controlling precedent. *Thomas, supra*, at 587 ("[P]ractical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III"); *Schor, supra*, at 851 ("[T]he Court has declined to adopt formalistic and unbending rules" for deciding Article III cases).

## B

Applying *Schor'*s approach here, I conclude that the delegation of adjudicatory authority before us is constitutional. A grant of authority to a bankruptcy court to adjudicate compulsory counterclaims does not violate any constitutional separation-of-powers principle related to Article III.

First, I concede that *the nature of the claim to be adjudicated* argues against my conclusion. Vickie Marshall's counterclaim—a kind of tort suit—resembles "a suit at the common law." *Murray's Lessee*, 18 How., at 284. Although not determinative of the question, see *Schor*, 478 U. S., at 853, a delegation of authority to a non-Article III judge to adjudicate a claim of that kind poses a heightened risk of encroachment on the Federal Judiciary, *id.*, at 854.

At the same time the significance of this factor is mitigated here by the fact that bankruptcy courts often decide claims that similarly resemble various common-law actions. Suppose, for example, that ownership of 40 acres of land in the bankruptcy debtor's possession is disputed by a creditor. If that creditor brings a claim in the bankruptcy court, resolution of that dispute requires the bankruptcy court to apply the same state property law that would govern in a state court proceeding. This kind of dispute arises with regularity in bankruptcy proceedings.

Of course, in this instance the state-law question is embedded in a debtor's counterclaim, not a creditor's claim. But the counterclaim is "compulsory." It "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. Rule Civ. Proc. 13(a); Fed. Rule Bkrtcy. Proc. 7013. Thus, resolution of the counterclaim will often turn on facts identical to, or at least related to, those at issue in a creditor's claim that is undisputedly proper for the bankruptcy court to decide.

Second, *the nature of the non-Article III tribunal* argues in favor of constitutionality. That is because the tribunal

is made up of judges who enjoy considerable protection from improper political influence. Unlike the 1978 Act which provided for the appointment of bankruptcy judges by the President with the advice and consent of the Senate, 28 U. S. C. §152 (1976 ed., Supp. IV), current law provides that the federal courts of appeals appoint federal bankruptcy judges, §152(a)(1) (2006 ed.). Bankruptcy judges are removable by the circuit judicial counsel (made up of federal court of appeals and district court judges) and only for cause. §152(e). Their salaries are pegged to those of federal district court judges, §153(a), and the cost of their courthouses and other work-related expenses are paid by the Judiciary, §156. Thus, although Congress technically exercised its Article I power when it created bankruptcy courts, functionally, bankruptcy judges can be compared to magistrate judges, law clerks, and the Judiciary's administrative officials, whose lack of Article III tenure and compensation protections do not endanger the independence of the Judicial Branch.

Third, *the control exercised by Article III judges over bankruptcy proceedings* argues in favor of constitutionality. Article III judges control and supervise the bankruptcy court's determinations—at least to the same degree that Article III judges supervised the agency's determinations in *Crowell*, if not more so. Any party may appeal those determinations to the federal district court, where the federal judge will review all determinations of fact for clear error and will review all determinations of law *de novo*. Fed. Rule Bkrtcy. Proc. 8013; 10 Collier on Bankruptcy ¶8013.04 (16th ed. 2011). But for the here-irrelevant matter of what *Crowell* considered to be special "constitutional" facts, the standard of review for factual findings here ("clearly erroneous") is more stringent than the standard at issue in *Crowell* (whether the agency's factfinding was "supported by evidence in the record"). 285 U. S., at 48; see *Dickinson* v. *Zurko*, 527 U. S. 150,

152, 153 (1999) ("unsupported by substantial evidence" more deferential than "clearly erroneous" (internal quotation marks omitted)). And, as *Crowell* noted, "there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges." 285 U. S., at 51.

Moreover, in one important respect Article III judges maintain greater control over the bankruptcy court proceedings at issue here than they did over the relevant proceedings in any of the previous cases in which this Court has upheld a delegation of adjudicatory power. The District Court here may "withdraw, in whole or in part, any case or proceeding referred [to the Bankruptcy Court] . . . on its own motion or on timely motion of any party, for cause shown." 28 U. S. C. §157(d); cf. *Northern Pipeline*, 458 U. S., at 80, n. 31 (plurality opinion) (contrasting pre-1978 law where "power to withdraw the case from the [bankruptcy] referee" gave district courts "control" over case with the unconstitutional 1978 statute, which provided no such district court authority).

Fourth, the fact that *the parties have consented* to Bankruptcy Court jurisdiction argues in favor of constitutionality, and strongly so. Pierce Marshall, the counterclaim defendant, is not a stranger to the litigation, forced to appear in Bankruptcy Court against his will. Cf. *id.*, at 91 (Rehnquist, J., concurring in judgment) (suit was litigated in Bankruptcy Court "over [the defendant's] objection"). Rather, he appeared voluntarily in Bankruptcy Court as one of Vickie Marshall's creditors, seeking a favorable resolution of his claim against Vickie Marshall to the detriment of her other creditors. He need not have filed a claim, perhaps not even at the cost of bringing it in the future, for he says his claim is "nondischargeable," in which case he could have litigated it in a state or federal court after distribution. See 11 U. S. C. §523(a)(6). Thus,

Pierce Marshall likely had "an alternative forum to the bankruptcy court in which to pursue [his] clai[m]." *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 59, n. 14 (1989).

The Court has held, in a highly analogous context, that this type of consent argues strongly in favor of using ordinary bankruptcy court proceedings. In *Granfinanciera,* the Court held that when a bankruptcy trustee seeks to void a transfer of assets from the debtor to an individual on the ground that the transfer to that individual constitutes an unlawful "preference," the question of whether the individual has a right to a jury trial "depends upon whether the creditor has submitted a claim against the estate." *Id.*, at 58. The following year, in *Langenkamp* v. *Culp*, 498 U. S. 42 (1990) *(per curiam)*, the Court emphasized that when the individual files a claim against the estate, that individual has

> "trigger[ed] the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power. If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction.*" *Id.*, at 44 (quoting *Granfinanciera*, 492 U. S., at 58; citations omitted).

As we have recognized, the jury trial question and the Article III question are highly analogous. See *id.,* at 52–53. And to that extent, *Granfinanciera*'s and *Langenkamp*'s basic reasoning and conclusion apply here: Even when private rights are at issue, non-Article III adjudication may be appropriate when both parties consent. Cf. *Northern Pipeline*, *supra*, at 80, n. 31 (plurality opinion)

(noting the importance of consent to bankruptcy jurisdiction).  See also *Schor*, 478 U. S., at 849 ("[A]bsence of consent to an initial adjudication before a non-Article III tribunal was relied on [in *Northern Pipeline*] as a significant factor in determining that Article III forbade such adjudication").  The majority argues that Pierce Marshall "did not truly consent" to bankruptcy jurisdiction, *ante*, at 27–28, but filing a proof of claim was sufficient in *Langenkamp* and *Granfinanciera*, and there is no relevant distinction between the claims filed in those cases and the claim filed here.

Fifth, *the nature and importance of the legislative purpose served* by the grant of adjudicatory authority to bankruptcy tribunals argues strongly in favor of constitutionality.  Congress' delegation of adjudicatory powers over counterclaims asserted against bankruptcy claimants constitutes an important means of securing a constitutionally authorized end.  Article I, §8, of the Constitution explicitly grants Congress the "Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  James Madison wrote in the Federalist Papers that the

> "power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question."  The Federalist No. 42, p. 271 (C. Rossiter ed. 1961).

Congress established the first Bankruptcy Act in 1800. 2 Stat. 19.  From the beginning, the "core" of federal bankruptcy proceedings has been "the restructuring of debtor-creditor relations."  *Northern Pipeline*, *supra*, at 71 (plurality opinion).  And, to be effective, a single tribunal must have broad authority to restructure those relations, "hav-

ing jurisdiction of the parties to controversies brought before them," "decid[ing] all matters in dispute," and "decree[ing] complete relief." *Katchen* v. *Landy*, 382 U. S. 323, 335 (1966) (internal quotation marks omitted).

The restructuring process requires a creditor to file a proof of claim in the bankruptcy court. 11 U. S. C. §501; Fed. Rule Bkrtcy. Proc. 3002(a). In doing so, the creditor "triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power." *Langenkamp*, *supra*, at 44 (quoting *Granfinanciera*, *supra*, at 58). By filing a proof of claim, the creditor agrees to the bankruptcy court's resolution of that claim, and if the creditor wins, the creditor will receive a share of the distribution of the bankruptcy estate. When the bankruptcy estate has a related claim against that creditor, that counterclaim may offset the creditor's claim, or even yield additional damages that augment the estate and may be distributed to the other creditors.

The consequent importance to the total bankruptcy scheme of permitting the trustee in bankruptcy to assert counterclaims against claimants, *and resolving those counterclaims in a bankruptcy court*, is reflected in the fact that Congress included "counterclaims by the estate against persons filing claims against the estate" on its list of "[c]ore proceedings." 28 U. S. C. §157(b)(2)(C). And it explains the difference, reflected in this Court's opinions, between a claimant's and a nonclaimant's constitutional right to a jury trial. Compare *Granfinanciera*, *supra,* at 58–59 ("Because petitioners . . . have not filed claims against the estate" they retain "their Seventh Amendment right to a trial by jury"), with *Langenkamp*, *supra,* at 45 ("Respondents filed claims against the bankruptcy estate" and "[c]onsequently, they were not entitled to a jury trial").

Consequently a bankruptcy court's determination of

such matters has more than "some bearing on a bank-
ruptcy case." *Ante*, at 34 (emphasis deleted). It plays a
critical role in Congress' constitutionally based effort to
create an efficient, effective federal bankruptcy system.
At the least, that is what Congress concluded. We owe
deference to that determination, which shows the absence
of any legislative or executive motive, intent, purpose, or
desire to encroach upon areas that Article III reserves
to judges to whom it grants tenure and compensation
protections.

Considering these factors together, I conclude that, as in
*Schor*, "the magnitude of any intrusion on the Judicial
Branch can only be termed *de minimis*." 478 U. S., at 856.
I would similarly find the statute before us constitutional.

## III

The majority predicts that as a "practical matter" to-
day's decision "does not change all that much." *Ante*, at
36–37. But I doubt that is so. Consider a typical case:
A tenant files for bankruptcy. The landlord files a claim
for unpaid rent. The tenant asserts a counterclaim for
damages suffered by the landlord's (1) failing to fulfill his
obligations as lessor, and (2) improperly recovering pos-
session of the premises by misrepresenting the facts in
housing court. (These are close to the facts presented in
*In re Beugen*, 81 B. R. 994 (Bkrtcy. Ct. ND Cal. 1988).)
This state-law counterclaim does not "ste[m] from the
bankruptcy itself," *ante*, at 34, it would not "necessarily be
resolved in the claims allowance process," *ibid.*, and it
would require the debtor to prove damages suffered by the
lessor's failures, the extent to which the landlord's repre-
sentations to the housing court were untrue, and damages
suffered by improper recovery of possession of the prem-
ises, cf. *ante*, at 33-33. Thus, under the majority's holding,
the federal district judge, not the bankruptcy judge, would
have to hear and resolve the counterclaim.

Why is that a problem?  Because these types of disputes arise in bankruptcy court with some frequency.  See, *e.g.*, *In re CBI Holding Co.,* 529 F. 3d 432 (CA2 2008) (state-law claims and counterclaims); *In re Winstar Communications, Inc.*, 348 B. R. 234 (Bkrtcy. Ct. Del. 2005) (same); *In re Ascher*, 128 B. R. 639 (Bkrtcy. Ct. ND Ill. 1991) (same); *In re Sun West Distributors, Inc.*, 69 B. R. 861 (Bkrtcy. Ct. SD Cal. 1987) (same).  Because the volume of bankruptcy cases is staggering, involving almost 1.6 million filings last year, compared to a federal district court docket of around 280,000 civil cases and 78,000 criminal cases.  Administrative Office of the United States Courts, J. Duff, Judicial Business of the United States Courts: Annual Report of the Director 14 (2010).  Because unlike the "related" non-core state law claims that bankruptcy courts must abstain from hearing, *see ante*, at 36, compulsory counterclaims involve the same factual disputes as the claims that may be finally adjudicated by the bankruptcy courts.  Because under these circumstances, a constitutionally required game of jurisdictional ping-pong between courts would lead to inefficiency, increased cost, delay, and needless additional suffering among those faced with bankruptcy.

For these reasons, with respect, I dissent.